IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF ALASKA

IN THE MATTER OF:

**JAMES MICHAEL WELLS**

Case No. 3:13-mj-00027-DMS  JDR

## AFFIDAVIT IN SUPPORT OF A
## CRIMINAL COMPLAINT

I, **ELIZABETH OBERLANDER**, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent (SA) of the United States Department of Justice, Federal Bureau of Investigation (FBI). I have been so employed for approximately 8 years. I am currently assigned to the FBI Violent Crimes Squad, Anchorage Field Division, and have been so assigned for the past 2.5 years. As a part of my official duties, I investigate violent crimes committed in areas under the special maritime and territorial jurisdiction of the United States.

### PROBABLE CAUSE

2. The evidence set forth in this affidavit provides probable cause to believe that JAMES MICHAEL WELLS willfully, deliberately, maliciously, and with premeditation, unlawfully killed United States Coast Guard Electronic's Technician First Class (ET1) James A. Hopkins and United States Coast Guard Civilian Employee Richard W. Belisle on April 12, 2012, employees of the United States engaged in or on account of their official duties, at Building T2 (Rigger Shop) United States Coast Guard Communications Station Kodiak, AK in violation of Title 18, United States Code, Section 1114, Murder of a Federal Officer or Employee.

3. The facts set forth in this affidavit are based on my personal knowledge; knowledge obtained from other individuals, including other law enforcement officers; interviews of persons with knowledge; my review of documents, interview reports and computer records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience. This affidavit contains information necessary to support probable cause for this application and does not contain every material fact that I have learned during the course of this

investigation; however, no information known to me that would tend to negate probable cause has been withheld from this affidavit.

4. Based on the information discussed in detail below, JAMES WELLS had the opportunity to commit the murders of Hopkins and Belisle, as detailed in the following sequence of events starting in paragraph 23. There is probable cause to believe WELLS drove from his home in Bells Flats, past the main gate camera at BSU Kodiak, then pulled into the parking lot at Kodiak State Airport. WELLS then switched to his wife's small blue Honda CR-V and drove to COMMSTA Kodiak. After the murders, he then returned to Kodiak State Airport, switched back to his white Dodge pickup. He drove back toward his residence, again passing the main gate of BSU Kodiak. This all occurred between 6:48 a.m. and 7:22 a.m. on April 12, 2012. After returning to his home, Wells put his alibi into effect, placing calls to his supervisors and co-workers, including both dead men, claiming that he would be late because of a flat tire. The alibi was proven false in that the tire he claimed was flat and removed from the truck because it contained a nail was forensically examined. The forensic examination revealed that nail was inserted by a nail gun, and the tire had never been driven on after the nail was inserted.

5. Defendant Name: James Michael Wells

6. Residence Address:           365 Pavloff Circle Kodiak, AK 99615
   Residence Description:       Blue 2 story dwelling/reddish colored roof

7. Vehicle 1:

   2002, extended cab, two door, white, Dodge Ram 2500 Pickup truck, AK Plate VCG 520, VIN: 3B7KF23622m307642, with white camper top over the bed, registered to James or Nancy Wells of 365 Pavloff Circle, Kodiak, AK. The camper top has a horizontally slanted race track shaped window extending about ¾ the length with two smaller vertically oriented racetrack shaped windows toward the rear. The back window of the camper top is not present and the roof line slopes upward toward the rear of the vehicle.

8. Vehicle 2:

   2001 Blue Honda CR-V, AK Plate EJR582, VIN: JHLRD18491C042288, Registered to James or Nancy Wells of 365 Pavloff Circle, Kodiak, AK.

9. A review of property records in Kodiak Borough and in information maintained by the Alaska Public Safety Information Network (APSIN) disclosed that James Michael WELLS and Nancy Jean WELLS are the owners of the residence and two vehicles described above. Employment records maintained by the United States Coast Guard disclose that James Michael WELLS resides at 365 Pavloff Circle, Kodiak, AK 99615.

**Jurisdictional Matters**

10. James M. WELLS is employed by the United States Coast Guard as an Antenna Maintenance Specialist (Wage Grade 10) at United States Coast Guard (USCG) Communications Station (COMMSTA) Kodiak, AK. He has been employed there since approximately 1990.

11. On April 12, 2012 at 0747 hours, Alaska State Troopers (AST) responded to a 911 emergency call from USCG COMMSTA Kodiak. On arrival, AST found Coast Guard Police Department (CGPD) and Coast Guard Fire Department (CGFD) on scene responding to the emergency call. On AST's entrance into the Rigger shop, Troopers found two adult males on the floor of the Rigger Shop with several medical personnel present. Both victims appeared to be moved from their original positioning by medical personnel.

12. The first victim observed by AST was ET1 James Hopkins, who was lying on his back with one gunshot wound to his right torso and wounds to his mouth and nose area. He also had what appeared to be wounds to his right arm and lost a large amount of blood that had started to coagulate on the floor.

13. The second victim observed by AST was USCG Civilian employee Richard W. Belisle. Belisle was found in a separate office from the first victim, lying on the floor with at least one gunshot wound to the torso, a small amount of blood on the floor, and Belisle's face had a dark discoloration.

14. Physically, COMMSTA Kodiak is comprised of two primary buildings, T1 and T2. Building T1 is the main facility, housing the command staff, operations personnel, and most of the maintenance personnel.

15. Building T2, also known as the Rigger Shop, is the workplace of the antenna maintenance staff. Building T2 is on the same grounds as T1, located approximately 100 yards away.

16. The COMMSTA, including Building T2, is on property owned by the United States Coast Guard, an agency of the Department of Homeland Security. USCG Pacific Area Legal Counsel has informed me that this building is within the Special Maritime and Territorial Jurisdiction of the United States as set forth in 18 U.S.C. sec. 7(3) because it has been reserved or acquired for the use of the United States.

17. ET1 (Petty Officer First Class – Electronics Technician) Hopkins was an active duty member of the United States Coast Guard, and was an employee of the United States. He was present

3

Case 3:13-mj-00027-JDR   Document 1-1   Filed 02/15/13   Page 3 of 15

at the Rigger Shop for the performance of his official duties which began at 0800 on April 12, 2012.

18. Mr. Belisle had been a civilian employee of the United States Coast Guard since November 13, 2005. He was present at the Rigger Shop for the performance of his official duties which began at 0700 on April 12, 2012.

**Geographic References**

19. The Coast Guard's main base in Kodiak, officially known as Base Support Unit (BSU) Kodiak, is located immediately south of the Kodiak State Airport. This allows Coast Guard fixed-wing aircraft to use the runways at Kodiak State Airport.

20. COMMSTA Kodiak is not located on the main facility of BSU Kodiak. It is located approximately 3 miles north-northwest of BSU Kodiak on Mile 2 of Anton Larsen Bay Road. The turn off for Anton Larson Bay Road is immediately north of the Kodiak State Airport.

21. The WELLS' residence on Pavloff Circle is located in the Bells Flats area, South of BSU Kodiak. Moreover, there is one primary road, Rezanof Drive/Chiniak Hwy, that runs from Bells Flats, past BSU Kodiak and the Kodiak State Airport, to the City of Kodiak.

22. To get from the WELLS' residence in the Bells Flats area to COMMSTA Kodiak, a vehicle must pass the Main Gate of BSU Kodiak and the entrance road to Kodiak State Airport.

**Timeline**

23. At approximately 6:48 a.m. on April 12, 2012 closed circuit television cameras (CCTC) located at the front gate of BSU Kodiak captured video of a white Dodge truck with a camper shell with two slanted rear windows passing the base heading to the north. WELLS is the registered owner of a truck fitting this description. A person traveling from Bells Flat on Rezanof Drive to either Kodiak State Airport or COMMSTA Kodiak must pass this gate and video camera.

24. Electronic access records for Building T2 show Richard Belisle's Access card was swiped at approximately 0700 hours which is consistent with the arrival of his vehicle at COMMSTA Building T2 Rigger Shop as viewed on CCTC. Building T2 is secured each night at the close of the day. On the evening of April 11, 2012, at approximately 1900 hours, the building was checked by a watch stander from T1. The building was secured, with all doors locked. Based on the electronic key logs and video surveillance, nobody entered the building on April 12, 2012 until Belisle arrived at 0700.

25. CCTV at COMMSTA Building T2 show ET1 James Hopkins' vehicle arrived at Building T2 at approximately 7:08 a.m.

4

26. CCTV from a tower near COMMSTA Kodiak Building T1 show a small blue Sport Utility Vehicle (SUV) driving on Anton Larson Bay Road arriving at and disappearing from view behind Building T2 at 7:09 a.m. The blue SUV appears to have the profile of an early-model Honda CRV. It also appears to have a black nose and black wheels. This vehicle did not enter the T2 parking lot via the primary entrance, and thus was not captured on the T2 video camera.

27. After the small blue SUV arrives at T2, at approximately 7:12 a.m., the same CCTV shows a jogger/walker on Anton Larson Bay Road, moving Southeasterly (in the direction of the Kodiak Airport). According to a witness interview of the jogger, Witness A, he heard a loud metal hitting metal sound come from the direction of Building T2 at approximately 0710 hours as he was walking away from the area. Building T2 is a concrete block structure located within 200 feet of Anton Larson Bay Road. As related to me by those agents with experience in such matters, the sound of a gunshot in such a structure could be perceived to be a loud metal sound.

28. According to CCTC near COMMSTA Building T1, a small blue SUV, again appearing to have a black nose, black wheels, and the profile of an early-model Honda CR-V was driving on Anton Larson Bay Road and came into view from behind Building T2 at 7:14 a.m. Again, this vehicle did not depart the T2 parking lot via the primary entrance, and thus was not captured on the T2 video camera.

29. A U.S. Coast Guardsman assigned to duties at T2 discovered the bodies of the victims at approximately 7:40 a.m. He reported the situation to T1, who alerted police and medical units. USCG military police conducted a security sweep and established that only one door was unlocked. The other doors remained secure. There were no other logged entries through the electronic lock other than as noted in paragraph 24 above.

30. The blue 2001 Honda CR-V owned by James WELLS was later found parked in the 2-hour parking lot at the Kodiak State Airport. At the time, the vehicle was equipped with black steel wheels and a black vinyl or fabric covering on the front (commonly called a "car bra"). When found in the parking lot, the SUV was unlocked and the keys were in/on the center console.

31. According to available closed circuit television cameras at BSU Kodiak, a white dodge truck with camper shell with two slanted rear windows was observed travelling on Rezanof Drive West/Chiniak Hwy towards Bells Flats, southbound from the Kodiak State Airport area at approximately 0722 hours.

32. Two USCG civilian employees who know WELLS, stated they witnessed James WELLS in his white dodge truck in the area of Bells Flats after 0722.

33. According to Witness B, a supervisor at USCG COMMSTA Kodiak, he received a voicemail from James WELLS at approximately 7:31 am. WELLS informed Witness B he had a flat

5

tire on his way into work and would be late to work. Witness B opined it is not common for James WELLS to be proactive with respect to keeping supervisors apprised of his whereabouts and activities. On the previous day WELLS whereabouts were unknown for approximately three hours between 9:00 am and 12:00 pm. WELLS had informed Witness B that he would be working in building T1 of the COMMSTA, a short distance away. Attempts to locate WELLS in building T1 during that time were unsuccessful.

34. A review of Hopkins' work voicemail revealed that WELLS had called Hopkins at approximately 7:30 am to leave a voice message that he had a flat tire and would be in when he had changed it. A review of Witness B's voicemail revealed that WELLS had called Witness B at approximately 7:31 am to tell Witness B that he had a flat tire and would be in when he had changed it. He also mentioned in his voice message to Witness B that he was having a problem with the lug nuts on the tire.

35. At approximately 11:00 a.m. on April 12, 2012, an individual employed by a civilian contractor spoke to WELLS on a work related matter. WELLS said nothing of the murder and stated only that "Rich" (Belisle) was "not available" and that they had "no immediate plans to climb the tower."

**Interviews**

36. Nancy Wells was interviewed in Anchorage during the evening of April 12, 2012. She confirmed that she flew out of Kodiak to Anchorage on Tuesday, April 10, 2012, leaving her blue Honda SUV in the 2-hour parking lot at the Kodiak Airport. According to the interview, James WELLS told her he got a flat tire on the morning of the murders. In addition, Mrs. Wells indicated there was a spare tire in a carrier under James WELLS white Dodge pickup. On April 14, 2012, Nancy Wells was escorted into her residence to retrieve personal items for herself and husband. She was escorted by two Special Agents of the U.S.C.G. Investigative Service. Nancy Wells told the Agents she would "happily" show them where the guns were located in the home. Nancy Wells went to a bedroom, opened a closet door, and said "This is where we keep the guns" and pointed to a silver colored plastic case on the upper shelf. She appeared somewhat confused as she looked at the upper shelf, then closed the closet door and added "Well, they are usually stored up there."

37. On November 16, 2012, Witness C was interviewed by CGIS agents in Kodiak. She explained that she rode with Nancy Wells when Mrs. Wells departed to Anchorage prior to murders on April 12, 2012. Witness C also accompanied Nancy Wells on the flight. Witness C remembers parking the blue Honda CRV in 2-hour parking close to the door of the main airport terminal. When agents found the CRV on April 12, 2012, after the murders, it was not near the terminal entrance, but farther north in the parking lot, adjacent to the old Mark Air terminal.

38. An interview of Witness B revealed the following information:

6

a. Witness B took over supervision of the COMMSTA Rigger Shop in July of 2010. At that time, WELLS and Belisle were the only two civilian employees at the shop. It became apparent to Witness B shortly after he took over that the "civilians" were running the shop. Witness B made it clear to Hopkins that Hopkins was in charge. Hopkins' assumption of a leadership role in the Rigger Shop caused tension between Hopkins and WELLS. WELLS was used to acting with little supervision.

b. Witness B assessed WELLS as being the most knowledgeable antenna mechanic on Kodiak Island and possibly the entire Coast Guard. Belisle's title was rigger, but there was not much difference between the job descriptions for rigger and antenna mechanic. Belisle's skill in electronics was weak, but he was a fast learner. WELLS and Belisle were both relied upon by the Coast Guard nationwide for their expertise.

c. In July of 2011 Witness B, WELLS, Hopkins, Belisle and other Rigger Shop personnel were erecting new towers on a remote Coast Guard facility. WELLS had decided that they were not going to install devices required by the Environmental Protection Agency on the towers. Witness B later decided that the devices must be installed as required by law. WELLS argued with Witness B over the decision and yelled at anyone who would listen that Witness B wasn't letting him do his job.

d. WELLS became ill in August of 2011 and was rarely in the office until January of 2012. WELLS eventually had his gall bladder removed and had surgery for a hernia.

e. During the period that WELLS was ill, members of the staff recall that Belisle, Hopkins and Witness B increased their knowledge and expertise. In addition, other staff members learned to rely on existing maintenance manuals, and realized that they could operate the Rigger Shop without Wells.

f. In September of 2011, a fuel card that was kept in WELLS' desk was reported missing by ET1 Hopkins. The fuel card was subsequently used at the Coast Guard BSU gas station and later found back in WELLS' desk. An investigation concluded that WELLS had used the card to fuel his personal vehicle. WELLS denied taking and using the fuel card. COMMSTA Commanding Officer, Executive Officer, and Witness B had a meeting with WELLS in February of 2012 in the Commanding Officer's office and presented him with a Letter of Caution regarding the incident. The Commanding Officer informed WELLS that he no longer trusted WELLS. WELLS repeatedly denied the accusation and repeated the phrase "It just doesn't sit right." WELLS was asked to sign the Letter of Caution, which he refused to do. All the participants of the meeting except for WELLS left the table. WELLS remained at the table alone and eventually signed the letter.

g. On November 2, 2011, Witness B called WELLS to his office to have WELLS sign a Memorandum for Record advising that trees on COMMSTA property were not to be cut and removed for personal use and that all tree removals must be approved by Witness B. It had come to Witness B's attention that trees were being collared, a

7

procedure that allows a tree to die slowly, and then removed in areas in which the trees would not have been a hazard to the towers or any other COMMSTA resource. Much of this wood was taken by WELLS for firewood. (Interviews with friends of WELLS indicate that he heats his home using a wood burning fireplace). During the discussion, WELLS asked Witness C about his (WELLS') role at the COMMSTA. Witness B informed WELLS that things were not looking good for him because of the tree collaring issue and the fuel card incident and that it was "time to get in line." Witness B and WELLS had a heated discussion which was loud enough to be overheard by individuals outside Witness B's office. During the argument, Witness B informed WELLS that the only reason he wasn't getting fired was because there were no cameras at the BSU gas station. WELLS thanked Witness B for his honesty.

h. Around the time that the aforementioned Memorandum of Record was issued, Belisle approached Witness B and attempted to disassociate himself with WELLS. WELLS and Belisle were often referred to as "Jim and Rich" since they were the only two civilian employees in the rigger's shop. Richard Belisle clarified to Witness B that it was to be "Jim or Rich," and Richard Belisle did not want to be associated with WELLS.

i. In December of 2011 Witness B had grown weary of hearing from other Rigger Shop employees that tasks were not being completed because WELLS wasn't ready or didn't want to do them. Witness B spoke to LT Pizzarro, who agreed that the rigger's shop staff should not wait for WELLS and should attempt to accomplish required tasks with or without WELLS' assistance. Witness B informed WELLS that they would no longer wait on him and that everyone that worked in the Rigger Shop, with the exception of one person, had told him that things didn't get done around the shop unless WELLS wanted to do them. Witness B told WELLS that he needed to come in and be a part of the process or retire. Witness B reported saying "I don't care which, but we're not doing this anymore." WELLS and Witness B had a heated argument which was heard by others outside of Witness B's office.

j. On or about January 17, 2012, Witness B told WELLS that he was not sending WELLS to the annual National Association of Tower Erectors (NATE) conference which WELLS regularly attended. Witness B told WELLS that he would not be going due to the aforementioned disciplinary problems and WELLS' excessive absences in the preceding months. Witness B further informed WELLS that Witness B, ET1 Hopkins, and Belisle would be attending the conference this year. WELLS questioned Witness B as to why ET1 Hopkins and Belisle were going. WELLS pointed at Belisle's chair and stated "he's not an antenna mechanic. He's just a rigger. I'm the mechanic and I should be going." Witness B and WELLS had a heated argument regarding Witness B's decision to not have WELLS attend the conference. After they had finished arguing, WELLS sat and stared at Witness C. Witness B stated that he was "sick" of WELLS' attitude and stared back for what

8

seemed like a long time, but was probably two or three minutes. Eventually both WELLS and Witness B broke eye contact with no further discussion.

    k. On April 11, 2012, the day prior to the murder of Belisle and Hopkins, WELLS, Belisle, Hopkins, Witness B, and other rigger's shop staff were discussing the best way to run an antenna cable. WELLS and Belisle suggested different ways of running the cable. Witness B stated that he preferred Belisle's method and engaged Belisle in conversation regarding the technical aspects of completing the task.

    l. Witness B stated that due to WELLS' disciplinary problems and extended absences, WELLS' status with the command structure had deteriorated. Witness B's assessment of WELLS was that WELLS thought he (WELLS) needed to be the "top dog." Belisle's ability and initiative were also being noticed by Witness B. Witness C stated that WELLS' "star was fading" while Belisle's was "starting to shine."

39. Witness D, a subordinate of ET1 James Hopkins in the Rigger Shop, was interviewed and stated Witness D believed ET1 James Hopkins was bitter because he had to keep correcting James WELLS' work, which led to ET1 James Hopkins and James WELLS not getting along in the shop.

40. An interview with a co-worker of Nancy Wells revealed that one week prior to the murder of Hopkins and Belisle, Nancy Wells was upset while at work. Nancy confided in her co-worker that she was upset over a situation at WELLS' job in which he was having problems with "the idiots that he works with." Nancy Wells provided no further details to her co-worker regarding the situation. In subsequent interviews with this co-worker, the co-worker stated that Nancy Wells told her that after he discovered the flat tire, he had to use a bathroom because of diarrhea, and used the bathroom at Servant Air, a business located at the Kodiak Airport. Nancy Wells also made similar statements to Witness D. Interviews of an employee at Servant Air on May 24, 2012, established that no person other than Servant Air employees had been in Servant Air on April 11, 2012 between 7:00 a.m. and 8:00 a.m.

41. Witness E, a former ETC at the COMSTA rigger's shop, was interviewed and stated that he was the supervisor of the Rigger Shop from 2002 to 2007. WELLS worked for Witness E during this entire period. Belisle was hired during Witness E's tenure at the Rigger Shop. Witness E stated that WELLS had a bad temper and difficulty controlling himself. Witness E provided the following additional information:

    a. On one occasion in late 2002, WELLS' wallet fell out of his pocket and between the seats of a government vehicle. WELLS screamed at the younger seamen in the shop and accused them of stealing it when he could not find it. He demanded that Witness E punish the seamen, which Witness E refused to do. WELLS became angry, got in his truck, and accelerated out of the parking lot so quickly that he lost control and hit a government vehicle. WELLS wallet was later found between the seats of the government vehicle he had been driving.

9

b. Witness E stated he was involved in two official disciplinary actions against WELLS. Witness E stated that WELLS was officially sanctioned in 2001 or 2002 for removing wood from COMMSTA property. Witness E also stated WELLS wanted to fly a communications hut from the island of Attu to COMMSTA Kodiak for repairs in 2004. Witness E ordered WELLS to leave the hut in Attu and request the parts needed for repairs be sent to Attu. The next day WELLS showed up in Kodiak with the hut.

c. WELLS disappeared often during work hours without letting anyone know where he was going. Witness E believed that WELLS was often working on the base assisting others, which was helpful when the COMMSTA needed help or assistance. WELLS was present and ready when important tasks needed to be completed. After Belisle was hired Witness E wasn't as concerned with WELLS disappearing since he had another employee to assist him.

42. In a series of non-custodial interviews (four on April 12 and two in April 13, 2012), James WELLS revealed the following information:

   a. JAMES WELLS has worked in the Rigger Shop since approximately 1990. Prior to 1990, he was a USCG active duty member. His normal assigned work hours are from 7:00 am to 3:30 pm. WELLS stated that the usual "practice is usually who's usually there first will go in through the electronic lock. Then you know, it's me or Rich. Or depending, you know. We start. You know, our day starts at 7. And then, usually Jim would show up anywhere from 7:10 to 7:30."

   b. JAMES WELLS stated he left his home at approximately 6:50 am on April 12, 2012, in order to head to work. During the drive he stopped to check his tires and found the right front tire to be low. When asked where he turned around, WELLS stated "probably" at the Comfort Inn. The Comfort Inn is located at the entrance road to Kodiak State Airport. At that time, WELLS said he made the decision to turn around and head back to his home. Upon arrival at his home, he stated he changed the tire and called COMMSTA to report he would be late, however he didn't remember in which order that happened. James WELLS stated he attempted to contact ET1 James Hopkins and Richard Belisle prior to calling Witness B. (A review of the voice mail accounts establish that these voice mails were left at 7:30 to 7:31 a.m., after the time Hopkins and Belisle were murdered, but before the bodies were discovered. In the voice mails, WELLS stated that he would be in to work as soon as he changed his flat tire. WELLS came to work sometime after 8:00 a.m.)

   c. When asked about firearms, James WELLS stated he owned a 7mm magnum rifle and a .45 ACP handgun. During questioning, James WELLS appeared to be evasive in his answers, regarding the number of guns owned and the caliber. When FBI

10

agents interviewed the wife of James WELLS in Anchorage on the early morning of April 13, 2012, her comments indicated he had additional firearms. In a search of the PREMISES conducted pursuant to warrant 3:12-mj-00157, WELLS was found to possess 2 handguns: a Ruger .44 magnum revolver and a Ruger .45 ACP pistol. He was also in possession of three shotguns and seven rifles. WELLS later agreed to turn these firearms over to the Alaska State Troopers for safety and security.

d. When asked, James WELLS consented for investigators to perform a quick search of his Dodge Ram 2500 pickup. Agents searched for blood stains and firearms. Agents found none.

e. In interviews conducted on April 12th and 13th, WELLS stated that on the morning of the murders, he was on his way to work when he noticed he had a low tire on the white Dodge pickup. He claimed that he pulled off the road near the Kodiak State Airport, looked at the tire, then returned to his home to change the tire because the spare tire and jack were at his residence. WELLS was asked how a person could evade detection by the CCTC located on building T2. WELLS told the investigators a person could park behind or beside the building and walk under the camera. WELLS drew a diagram for the investigators showing them the location, angles, and coverage of the camera.

f. Prior to being confronted with the information contained in paragraphs 23 and 31 above, agents questioned WELLS about how long it took him to drive from the Main Gate at BSU to the Kodiak airport on the morning of April 12, 2012. The agents presented WELLS with their estimate, based on driving the road themselves, that it would take 2-4 minutes. WELLS had the opportunity to object, but would not commit to a time. Then, WELLS was asked about how long it took for him to check his tire at the airport, and start driving back to his residence. He did not respond when the agents estimated that it took another 2 minutes. When combined with another 2-4 minutes to make the round trip back to the Main Gate at BSU, the total time would have been 6-10 minutes. When WELLS was confronted with that analysis, he did not commit a specific time, and when given the opportunity to correct the estimate, he did not. He was then advised that he passed the main gate of the Coast Guard Base Kodiak going north toward the COMMSTA at 6:48 am, and did not return past the main gate camera going South toward his residence until 7:22 am. When asked to reconcile the 34-minute gap shown by the camera and his estimate of 6-10 minutes, stated: "I can't think of why there would be the time discrepancy." Agents gave him an additional opportunity to explain the time discrepancy, asking him to help them account for the missing time. Wells stated: "I don't have a reasonable explanation for it." At no time in his interviews did WELLS offer any explanation for the missing time, including any statement of a need to use a bathroom because of diarrhea.

11

43. According to Witness F, a civilian Coast Guard employee, she was riding with a friend to the Kodiak State Airport on the morning of April 12, 2012, at approximately 6:45 am. Witness F stated that she was talking to the driver of the vehicle when she noticed a vehicle go by in the other direction that she believes was Nancy Wells' small blue SUV. The location was near the "Self Help." The "Self Help" is a Coast Guard owned warehouse at the corner of Rezanof Drive/Chiniak Highway and Anton Larson Bay Road. Agents reviewed CCTV of the Alaska Airlines check in counter which revealed that Witness F arrived at the counter at 6:46 a.m. Witness F knows Nancy Wells and regularly sees her car on the road. She can usually identify Nancy Wells as the driver. On this particular day Witness F did not see the driver. When Witness F was asked to provide details on why she believed the car was Mrs. Wells' vehicle, she could not provide details, but stated something to the effect that she just knew it was Nancy Wells' car. In a subsequent interview, Witness F stated that she believed the small blue SUV had a Coast Guard sticker. She did not name the black car bra as a distinguishing characteristic of the vehicle.

44. In an interview with the husband of Witness F, he related his conversation with his wife regarding her reported sighting of the Blue Honda CRV on April 12, 2012, to the interviewing agents. His recollection of the conversation was that his wife was not sure if the car she saw was Nancy Wells' car.

## Other investigation and information

45. Based on initial analysis by the Alaska medical examiner and the Alaska Crime Laboratory, both victims were shot multiple times. The medical examiner and criminologist at the Alaska Crime Laboratory have testified and been qualified as experts in state court proceedings. At the autopsy of Richard Belisle, the Medical Examiner removed a projectile from the cervical spine of Mr. Belisle. The projectile was intact, and was removed without further marking the item. That item has been submitted to forensic examination at the Alaska Scientific Crime Detection Laboratory. Findings are that the projectile is a .44 caliber bullet bearing markings of a 5 right twist, consistent with a Smith & Wesson Model 29/629 revolver, a Taurus revolver, or a Llama revolver. In searches conducted to date, investigators have not located such a weapon. A Smith and Wesson Model 629 is a stainless steel (silver-colored) revolver. The findings of the State criminologist establish that the .44 Ruger revolver recovered from WELLS' residence is not the murder weapon. Thus, law enforcement does not have possession of the murder weapon at this time.

46. Witness G stated under oath that he was a friend of WELLS and had on at least one occasion hunted with WELLS. Witness G stated that on at least one occasion, WELLS was armed with a silver-colored revolver of unknown caliber, but which Witness G stated was "a bear gun". In the searches of WELLS' residence and vehicles, only one revolver was recovered, the .44 caliber Ruger. The Ruger was blued steel. Investigators have not found the silver-colored revolver in any location associated with WELLS.

47. The Alaska State Crime Lab criminologist reported that the bullets recovered from the bodies and crime scene were .44 caliber jacketed soft points. In the execution of search warrant 3:12-mj-00157 at WELLS' residence, investigators recovered and seized .44 caliber jacketed soft point ammunition. The jacketed soft point ammunition was analyzed at the FBI laboratory by a criminologist who has previously been qualified as an expert in the District of Alaska on firearms and tool markings. The criminologist reported that the bullets from the ammunition found at WELLS' residence are consistent with the bullets recovered from the crime scene.

48. A number of factors related to the homicide of Hopkins and Belisle indicate a level of advanced planning and knowledge of the routines of T2.

    - The person who committed the murder chose a time when only a limited number of the staff was required to be on duty at T2, or had normally arrived at T2, and well before the remainder of the staff arrived at 7:45 – 8:00 am. In his interviews, WELLS states that Belisle arrives at 7:00 and Hopkins between 7:10 and 7:30.

    - The person committing the murders also apparently knew that the remainder of the crew would not be in until after 7:30 a.m. Thus, by arriving almost precisely at 7:10 a.m., the murderer maximized the time they had to commit the crime without interruption and escape.

    - Any person approaching Building T2 at 7:09 a.m. on April 12, 2012, would have seen four trucks parked in front of the building: 2 government trucks and the personal trucks of Belisle and Hopkins. A person not familiar with the daily routines and operations at T2 would be faced with the possibility of confronting four or more persons in the building.

    - Moreover, the person chose a route into building T2 that prevented the camera on that building to capture an image of the vehicle.

    - Finally, the murder weapon has not been located, indicating that it was disposed of or hidden with some thought, and the murderer left a limited forensic trail in building T2, indicated planned steps to prevent leaving trace evidence. All of this adds up to a significant level of advanced planning and knowledge of the daily routines at Building T2.

49. On April 19, 2012, as authorized in search warrant 3:12-mj-00163, agents drove Nancy Wells' blue Honda CR-V on Anton Larsen Bay Road past Building T2 and captured that movement on the T1 camera for comparison with the video images of the blue SUV captured on the morning of April 12, 2012. I have examined still photo screen captures of the vehicles shown in those two videos, and the images of the vehicles appear to be consistent.

50. Pursuant to search warrant 168 issued on April 18, 2012 in the District of Alaska a studded truck tire, described as LT265/75R16 BF Goodrich Commercial Traction T/A, was seized from the bed of WELLS' white Dodge pickup truck. A 3 ½ to 4 inch long nail was embedded in a groove of the tire between two of the treads.

51. Forensic analysis of the tire was conducted by an independent laboratory recommended by the FBI Laboratory. The forensic engineer conducting the testing has 32 years' experience in the tire industry, including 22 years in forensic tire testing. The engineer concluded that the 3 ½ to 4 inch long nail was inserted into the tire manually and was not picked up nor present during normal operation of the vehicle. This conclusion is based on the following factors:

    a. There was no evidence of pavement or debris abrasion on the nail head which would necessarily be present had the nail been picked up during normal vehicle operation.
    b. The nail was located in the groove between the tread and had penetrated to the extent that the nail head was below the height of the tread. The nail head would not have penetrated below the height of the tread had it been picked up during normal operation.
    c. The nail shank was not bent and the nail penetrated the tire at an angle nearly perpendicular to the tire surface. A nail of this length could only penetrate the tire at an oblique angle during normal operation or the shank would be bent as the tire rolled over it.

52. Markings on the nail head indicated that it has been driven using an automatic or pneumatic nailer.

## CONCLUSION

53. Witness names have been replaced with letters to preserve the privacy of the witnesses. None of the witnesses identified by letters are known to have criminal histories and are all believed by the affiant to be reliable.

54. Based on the foregoing, there is probable cause to believe that James Michael Wells left his residence the morning of April 12, 2012. WELLS passed the Main Gate at BSU Kodiak driving his white Dodge pickup northbound at approximately 6:48 a.m. WELLS passed the gate southbound towards his residence at approximately 7:22 a.m. In between those times, there is probable cause to believe that WELLS drove to the Kodiak Island airport where he retrieved his wife's early model Honda CR-V, drove to Building T2 at the COMMSTA,

14

arriving at approximately 7:09 a.m., entered the building and shot ET1 James Hopkins, and active duty member of the United States Coast Guard, and Richard Belisle, a civilian employee of the United States Coast Guard, multiple times, killing them both while they were engaged in their duties as employees of the United States Coast Guard. WELLS then left T2 at approximately 7:14 a.m., drove to Kodiak Island airport and retrieved his white Dodge pickup, and returned to his residence. Moreover, there is probable cause to believe that the "flat tire" alibi is false, and was fabricated by WELLS to account for why he allegedly was not at Building T2 at the time his co-workers were murdered. Forensic testing revealed that the nail in WELLS' tire was intentionally placed with a nail gun, and had not been driven on.

55. I submit that this affidavit supports probable cause that JAMES MICHAEL WELLS murdered U.S. Coast Guard Petty Officer James Hopkins and U.S. Coast Guard civilian employee Richard Belisle on April 12, 2012 at U.S. Coast Guard Communications Station Kodiak, Alaska, in violation of Title 18, United States Code, Section 1114, Murder of a Federal Officer or Employee.

Respectfully submitted,

/s/ Signature Redacted

ELIZABETH OBERLANDER
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on February 14, 2013:

/s/John D. Roberts, USMJ
Signature Redacted
UNITED STATES MAGISTRATE JUDGE